(No. 14520.—Judgment affirmed.)
HENRY C. PEEK *et al.* Appellants, *vs.* THE WOMAN'S HOME
MISSIONARY SOCIETY, Appellee.

*Opinion filed October 21, 1922.*

WILLS—*when condition of devise to charitable organization is sufficiently complied with.* A condition that the devisee establish, within three years after the death of the testatrix, an orphanage on the premises devised, is sufficiently complied with where the devisee accepted the gift within a year after such death but during the next two years was compelled to defend suits brought by different heirs, though in the meantime the devisee made attempts peaceably to take possession but was prevented by the tenant in possession, and the question whether the devise created a condition subsequent or a conditional limitation is immaterial.

DUNN, J., THOMPSON, C. J., and CARTWRIGHT, J., dissenting.

APPEAL from the Circuit Court of Ogle county; the Hon. F. J. STRANSKY, Judge, presiding.

SEYSTER & FEARER, for appellants.

WILLIAM C. RIGBY, and URBAN A. LAVERY, (M. C. SLUTES, of counsel,) for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Ogle county finding the title to certain land in said county to be in the Woman's Home Missionary Society of the Methodist Episcopal Church in fee simple and denying the petition at law of certain appellants for partition of the land.

The cause arises out of the provisions of the will of Martha E. Peek, whereby she gave a farm of about 150 acres to the missionary society for the establishment and maintenance of an orphans' home. The provisions of the will in that regard are set forth at length in the court's statement in a prior decision with reference to the same (*Eaton* v. *Home Missionary Society,* 264 Ill. 88,) and need

not be here set forth. The ownership of the farm as affected by the will has been the source of considerable litigation between the heirs of Mrs. Peek and the heirs of her husband on the one part and the missionary society on the other. It is stated in the briefs of appellants that this is the eighth time the society has been called upon in various courts to defend its claim of title to said farm. The cause in its various phases has been in this court heretofore three times. (*Eaton* v. *Home Missionary Society, supra; Peek* v. *Home Missionary Society,* 293 Ill. 337; *Eaton* v. *Home Missionary Society,* 298 id. 476.) In the first case decided by this court it was alleged in the bill filed by the heirs of Mrs. Peek that the missionary society was not legally authorized to take and hold the farm. In that proceeding the case was decided, both in the trial court and this court, against the contentions of the Eaton heirs, and this court held that the society was legally authorized to take and hold the farm. The record in this case tends to show that the society was prevented from taking actual possession of the farm for a year and eight months after the first suit was determined, by the tactics of the tenant, Rebuck. The society finally obtained possession of the farm February 28, 1916, and on that same day, or the day before, the heirs of Mrs. Peek filed another bill in the circuit court again seeking to oust the society from the farm on the ground that it had not complied with the provisions of the will. A demurrer filed by the society to that bill was sustained, and later the Eaton heirs filed an amended bill, to which the society again demurred, and the demurrer was sustained on January 29, 1918, and the trial court entered an order dismissing the bill for want of equity. From that judgment the Eatons prayed an appeal to this court, which was never perfected. More than two years thereafter the Eatons sued out a writ of error from this court to review the last mentioned judgment, and in June, 1921, this court again affirmed the judgment of the trial court and refused

to oust the society from the farm.   (*Eaton* v. *Home Missionary Society,* 298 Ill. *supra.*)   While the litigation in behalf of the Eaton heirs heretofore referred to was in progress, the heirs of the deceased husband of Mrs. Peek started the litigation now under consideration, and a trial was had in January, 1920, and a judgment was entered by the trial court ousting the society from the farm and awarding the farm to the Peeks and Eatons.   From that judgment the society prayed an appeal to this court, and in June, 1920, the judgment was reversed and the cause remanded.   (*Peek* v. *Home Missionary Society, supra.*)   Nothing appears to have been done by the Peeks thereafter for over a year, but in October, 1921, this last case was brought to trial in the court below.   On that trial judgment was entered finding title in the society and denying the rights of both the Eaton and Peek heirs to an interest in the farm, as heretofore stated.   From that judgment both the Peeks and the Eatons have prayed an appeal to this court.

It was stated in the former opinion of this court in this proceeding that the evidence as to what efforts and steps had been taken by the society to establish the orphanage prior to February 28, 1916, was not as full as it should be. Accordingly, after the judgment in this proceeding had been reversed and the cause remanded for further hearing, the society introduced evidence at length to show the various steps that had been taken by its representatives to put the orphanage into actual operation during the three years immediately following Mrs. Peek's death.   It appears from this evidence that within a few months after her death a local committee was appointed by the Rock River Conference at a meeting held in Chicago and a local committee was given direct charge of organizing the proposed Peek Orphanage.   Mrs. Ray, who resided at Polo, Illinois, near which the farm is located, was made chairman of the local committee, and as chairman she attended the national convention of the society held in DesMoines in October,

1912, where the question of Mrs. Peek's will was considered and her bequest accepted. Later, in the fall of 1912, Mrs. Ray, as such local chairman, visited the farm and talked with the tenant, Rebuck, about the society obtaining possession. Dr. Eaton, who was one of the Eaton heirs and had been appointed executor, claimed possession of the farm during the first year after Mrs. Peek's death and instructed the tenant to pay him the rent during that year, which the tenant did. It thus appears from the record before us that during the first year after Mrs. Peek's death the society was prevented from taking actual steps to start the orphanage by the fact that Dr. Eaton, as executor, was in possession of the farm as the representative of the estate, and by the further fact that the right of the society to take the farm was denied from the beginning and was openly contested by both the Peeks and the Eatons, the contest as to the Eaton heirs being started about a year after Mrs. Peek's death, as heretofore stated, and these proceedings by Mrs. Peek's heirs something over a year thereafter. After the decision of this court in *Peek* v. *Home Missionary Society, supra,* Mrs. Ray again visited the farm and talked with Rebuck, the tenant, about getting possession for the society. He told her "he would stay as long as he wanted to and would move when he wanted to." It appears from the record that there had been a written lease given by Mrs. Peek to Rebuck, and that he was holding the farm at her death under this lease, and continued to hold it under the lease from year to year without any renewal, but that none of the officers of the society ever saw the lease, although they had made requests to be permitted to see it. Rebuck claimed to some such officers that the lease contained a provision requiring six months' notice in writing to him before March 1 of each year, and that unless such notice was served he could hold the farm for another year thereafter. If his statement in that respect was correct it meant that a written notice had to be served on him by September 1 in order

to have the lease terminate on March 1 the following year. The first time the case was here (264 Ill. *supra,*) it was decided in June, 1914, and the time for filing a petition for rehearing did not expire until July 1, 1914. Taking the facts, therefore, as claimed by the tenant as to the time when notice must be given to end the lease before the following March, there was less than two months after this first litigation was ended within which the society could legally take steps to evict Rebuck from the farm before the three years expired. Therefore, if the contention of counsel for appellants is sustained, the society must be held to have forfeited the farm because it did not serve Rebuck with a written notice to vacate within less than two months after the first Eaton suit was determined, and at that time the society had no actual knowledge of the requirements in the lease. The record further shows that after the summer of 1914 representatives of the society made several efforts to induce the tenant to change his mind and leave the farm, and also made efforts to induce him to permit orphans to be placed on the farm while he remained there. All of these efforts proved futile. Mrs. Ray testified she made several trips to the farm for this purpose within the three-year period, and Mrs. Franks, of Polo, who was a member of the local committee, went to the farm with Mrs. Ray more than once for this purpose and testified to that effect. Mrs. Dangel, who was an officer of the society, went from her home in Oak Park to the farm at Polo in the spring of 1915 in an effort to induce Rebuck to move off or to permit the society to put up a tent on the farm in which to care for orphans, but Rebuck absolutely refused either to leave the farm or permit the putting up of such tent. Mrs. Dangel also testified that she again took the trip to the farm and interviewed Rebuck the following January and again asked permission to put children on the farm, but both requests were denied by Rebuck. Mrs. Kingery, an officer of the society, who also lived in

Oak Park, testified that in April, 1915, she went from her home to the farm at Polo and there interviewed Rebuck in company with Mrs. Dangel and Mrs. Ray and he refused all of the requests that they made with reference to the same. The record also shows that Mrs. Kingery's husband, who was an honorary member of the society, and Rigby, who was the attorney for the society in Chicago, went from Chicago to Polo in the spring or late winter of 1915 for the purpose of inducing Rebuck to leave the farm peaceably but they failed in their attempts.

After the cause was reversed on the former hearing (293 Ill. *supra,*) and the cause re-instated in the circuit court the appellants in this cause filed three replications, and the missionary society filed a rejoinder, taking issue on each replication. Issues of fact were thereby raised on the first plea, and the trial court on the last hearing in this proceeding held that the missionary society had, upon the facts, sustained its position on the issues, the decree of the trial court stating that the court found "that the defendant, Woman's Home Missionary Society, did not fail and neglect, as alleged in the said petition, to establish a home for orphan children or orphanage upon the said lands, but, on the contrary, the court finds that the defendant did establish upon the said lands, and has since maintained and does now maintain, a home for orphan children or orphanage known as the Peek Orphanage, all of which the court finds has been done in compliance with the last will and testament of the said Martha E. Peek, deceased." While this finding of the trial court may not be in strict accordance with the issues raised by the pleadings in that case, and the only substantial issue on the first plea may have been whether the facts relieved appellee of performance and vested the title in it without performance of the conditions, the rulings with reference to the first plea by the trial court caused this court to reverse the former appeal. While there are no specific findings of the trial court with reference to the

replications and rejoinders in the first plea, there was a general finding for appellees in the trial court's decree on the last hearing on all the issues, and if the evidence that appears in the record and the facts proved justified the judgment it should be sustained by this court.

It is stated in appellee's brief in this cause that appellants' brief herein is an exact re-print of the brief and argument filed by them in the prior appeal in this court in 293 Ill. *supra,* except that a single additional case is cited. Every point and suggestion made by appellants on this appeal was raised by them in their former appeal in this court. The accuracy of this statement of counsel for appellee on this subject is in no way questioned or denied in the briefs of appellants here, so that it is manifest that this court in the hearing on the first appeal had before it the identical questions now discussed by counsel for appellants on this appeal, and having these facts in mind, in connection with the reading of the decision of this court in 293 Ill. *supra,* it is clear that the court passed on the merits of practically all the questions raised by appellants in their briefs in this appeal. This conclusion is strongly supported by a reading of that opinion, a portion of which states (p. 346) : "From all the testimony it appears to us that there was, in the exercise of good judgment by appellant, good reason for not taking the risk of the expenditure of a large amount of money in converting the premises into a home for orphan children while its title was disputed by the heirs. Appellant was at no time enjoined from establishing an orphanage on the farm, but under the circumstances even a society not organized for charitable purposes and with plenty of money and resources could hardly have been expected to risk the expenditure of money in preparing the farm for the use to which the testatrix desired it put, while its right to the property was denied and a considerable part of the time was being litigated. It is true the will made no provision for any such contingency but required the orphanage to be

304—28

established within three years after testatrix's death, but this provision should receive a reasonable construction. As we have said, it was not in contemplation of the testatrix that the heirs, who are all collateral heirs, would obstruct appellant in carrying out her intention and purpose by denying the title of appellant, talking about attacking it by litigation and actually bringing suit to defeat it until the three years had expired, and then claim and obtain the property on the ground that appellant had not appropriated the property to use as an orphans' home within three years. The three years allowed by the will in which the orphanage was to be established began to run at the death of Mrs. Peek. The first year after that occurred no litigation was actually commenced by the heirs to defeat the devise, and while the testimony to show a reason for the delay that year was meager, there was testimony that the heirs were denying the validity of the devise to appellant and discussing the proposition of bringing a suit to test it and also of a compromise with appellant. Moreover, the executor, who is one of the Eaton heirs, had possession through the tenant and claimed and collected the rents for that and the following year. Appellant was not by the terms of the will required to do anything the first year after the death of the testatrix except to accept the gift in writing, which it did. Then all of the second year after the death of the testatrix the suit to declare the devise to appellant void was pending."

Counsel for appellants argue the legal questions as if they were to be decided purely on the basis whether or not appellee had complied with the technical wording of the will with reference to the establishment of an orphanage on said farm. It is clear that this court, having in mind these exact contentions made in the former briefs of appellants, thought that the case should not be decided on purely technical grounds, for we said in the former opinion (p. 344) : "No orphans were placed on the farm until more than three years after the death of Martha E. Peek, and

the meritorious question involved is, Did appellant by its failure to establish an orphanage within that time, in view of the litigation affecting its title, forfeit its right to the premises? There is no dispute that the premises were not used as an orphanage within the three years, but it is contended by appellant that the testatrix did not have in contemplation the possibility that the heirs to whom she devised the land in the event appellant declined to accept the gift or failed to use it within the time required, would dispute appellant's right to the gift for the purposes for which it was devised and seek by litigation to deprive appellant of the property." The court in that opinion then goes on to state certain things with reference to the litigation, and states at least twice that the provision as to when the orphanage should be started should receive a reasonable construction, saying in this connection (p. 348) : It "should receive a reasonable construction, especially in view of the nature and character of the devise and the devisee, and in determining whether the delay was reasonable and prudent or negligent and unreasonable all evidence throwing light on the question should be admitted and considered. If the heirs seeking to profit by the delay in establishing the orphanage by their own acts and conduct materially contributed to produce the delay, it would seem most unconscionable to allow them to benefit by such acts and conduct."

There can be no question that this court intended to hold in its former opinion that the action of appellants in causing such delay might be very properly considered in deciding whether or not the missionary society had properly acted in attempting to establish the orphanage within the time required by the provisions of the testatrix's will. In view of the reasoning of the court in the former opinion we think the chancellor on the last hearing was fully justified in finding by his decree that the missionary society had not failed or neglected to establish an orphanage within the time required by the will. The ruling of this court

on the former hearing is in accord with the weight of
authority in this and other jurisdictions with reference to
construing wills as to charities.   This court in *Franklin* v.
*Hastings,* 253 Ill. 46, said on page 50, that in construing a
will with reference to charities such gifts "are looked upon
with peculiar favor by the courts, which take special care
to enforce them, and every presumption consistent with the
language used will be indulged to sustain them.   If a tes-
tator has manifested a general intention to give to charity,
the charity is regarded as the matter of substance, and the
gift will be sustained though it may not be possible to carry
it out in the particular manner indicated."

The language of the court in the case cited applies
with peculiar force to the facts here.   When the provision
of the will with reference to establishing the orphanage
within three years is read in connection with the entire will,
it seems clear that the primary purpose of Mrs. Peek found
in this provision of her will was to provide that the society
might take the farm for the establishment of an orphan-
age, and that she did not have in mind the opposition and
litigation started by the heirs of herself and her husband,
and later on the obstruction by her tenant, Rebuck, in pre-
venting the society from obtaining speedy possession of the
farm in order to establish such orphanage, and the ruling
of this court on the former appeal that the intent of the
testatrix as shown by the will,—the spirit and not the let-
ter,—should control in reaching a proper conclusion on that
question is in accord with the decisions generally in other
jurisdictions.

In *Adams* v. *First Baptist Church,* 11 L. R. A. (N. S.)
509, (148 Mich. 140,) where was discussed the question
whether a similar provision in a will created a condition
subsequent or a conditional limitation, we find an extended
note as to the rules of construction that should govern in
such cases, and in the foot-note the court stated a gen-
eral conclusion on such question (p. 515) :   "In settling

the meaning and effect of any provision in a last will and testament the determining factor is the intention of the testator, and that intention is ascertainable not alone from the provision itself but from a scrutiny of the entire instrument of which it is a part and in the light of the conditions and circumstances in which the instrument came into existence. These rules of construction are of universal application throughout the United States and Great Britain."

In another leading case, decided by the Supreme Court of North Carolina, *Lynch* v. *Melton,* 27 L. R. A. (N. S.) 684, (150 N. C. 595,) the court held that a devise which provided that a certain remainder should go to the niece of the testatrix provided she lived with her uncle, the testatrix's husband, until she became of age or married, otherwise to go as the law directed, was not defeated by the fact that the niece was compelled to leave the uncle's home by his insanity and the breaking up of the home, and in an extended note reaching the same conclusion on the legal question it is stated (p. 684) : "There is obvious justice in not holding the devisee or legatee responsible for the consequences of a breach of or failure to perform a condition where such breach or failure is not due to fault on his part and where it is clear that such a contingency was not within the testator's contemplation."

The two situations referred to in the note just quoted arise in the case now before us, viz., the breach or failure in this case was not due to the fault of appellee, and the contingency which arose delaying the establishment of the orphanage was not within the testatrix's contemplation at the time the will was drafted, and these two elements are urged by counsel for appellee as the chief factors why appellee has failed and neglected to establish the orphanage within the provisions of the will.

In *Mills* v. *Davison,* 54 N. J. Eq. 659, the court was considering a deed wherein the testatrix had granted property to the Protestant Episcopal Church, with a *habendum*

reading: "To have and to hold unto the said party of the second part and their successors forever, with this express condition and limitation: that neither the said party of the second part nor their successors shall at any time sell, mortgage or in any way convey the said lands and premises or any part thereof, and that no building shall be kept, maintained or erected thereon except for the purpose of public worship." It was said in discussing that provision (p. 664) : "The dominating rule in the construction of deeds and other written instruments is to so construe them as to give effect to the intention of the parties as far as is permitted by the rules of law. The prefatory words in the *habendum* in the deed in question are, 'upon this express condition and limitation.' In the court of chancery the word 'condition' in this sentence was construed as a condition designed for the benefit of the grantors, to defeat the estate granted. Such a construction, it 'seems to me, is contrary to the intent of the grantors in making the gift." It seems clear from a reading of this opinion that the argument of counsel for appellants as to whether the provisions of the will created a condition subsequent or a conditional limitation is immaterial, for whether the will created a condition subsequent or a conditional limitation, the court will look with favor on the efforts of the society to comply with the condition.

In *In re Pierpoint's Will,* 72 Vt. 204, the court had under consideration the provisions of the testatrix's will as to whether the property should go to a charity under the provisions of the will, or by a condition subsequent or a conditional limitation to one of her sisters. The testatrix died in February, 1890. It appeared that the hospital which was given the charitable bequest was incorporated two years after her death for the purpose of taking the bequest if it should turn out that the hospital was to receive it, but the hospital did not perfect its plans immediately and was not opened for patients until May, 1896, more than six years

after the testatrix's death.   In discussing the question as to whether the hospital had complied with the provisions of the will the court said (p. 209) :   "If no decisive steps had been taken within the five years the bequest would have been lost for that purpose.   But the various measures that were taken by the trustees, from the meeting in May, 1891, down to the end of five years from the death of the testatrix, which the court below found were continuous, amounted to an establishing of a hospital within that time. The obtaining a charter, the organization of the Rutland Hospital under it, the various meetings, the taking of a deed of the Pine Hill land and the work done upon that location, and the receipt of various contributions, all resulted in the purchase, equipment and opening of the Sheldon property as a hospital.   These steps taken within five years amounted to the establishing of a hospital according to the intention of the testatrix, so far as her intention can be ascertained from the language of the will."

The Supreme Court of Connecticut has also construed a will containing a provision somewhat similar to that here under consideration in *Appeal of Beardsley*, 77 Conn. 705, and said on page 710 :   "Taken literally as they stand, these [the words of the will] contain a requirement that the building shall be erected not later than January 1, 1901, and a provision that should it not be, the legacy shall go to the residuary legatees, for whom the appellant is trustee." After discussing at some length the questions involved and stating what the general intent of the testatrix was, the court continued (p. 711) :   "In a codicil now in question the general intent is plain.   A certain body of men, if incorporated by January 1, 1901, were to receive from her estate a fund of $5000, with the addition of accumulations of income earned by it after her decease, provided the corporation erected a memorial building on plans approved by special trustees whom she invested with authority to that effect."

The Supreme Court of Massachusetts in the case of *Capen* v. *Skinner,* 177 Mass. 84, considered a similar question, and after stating the facts and discussing whether the provisions of the will had been complied with, said (p. 86) : "Under the circumstances thus disclosed we do not see how it could be found that there had been a breach of the condition. Pending its actual operation for an old ladies' home, the property has been used in a manner consistent with that purpose and with that purpose in view. The trustees have exercised, as they had a right to do, their discretion in the matter, and there is nothing to show that they have not exercised it wisely."

While it may be conceded that the society in the case at bar did not in all respects take the technical legal steps that it might have taken to secure possession of this land within the three years provided by the will, it is clear that its officers made repeated friendly attempts to obtain possession of the farm from the tenant for the purpose of establishing an orphanage, and tried, when they failed in doing that, to obtain temporary occupancy by using a tent in order to place orphans on the farm prior to the expiration of the three-year limitation; that its representatives and officers made repeated visits to the farm to see if some such arrangement could not be made with the tenant, and that as soon as they did obtain actual possession of the farm they established an orphanage on it, where at the time of the last hearing in the trial court they supported a number of children. We can reach no other conclusion than that on the former hearing of this case (293 Ill. *supra,*) this court intended to hold that the meritorious question involved was whether the society used due diligence, under the provisions of the will, to establish the orphanage within three years; that on the former hearing the society was prevented by the rulings of the trial court in making proper proof; that if such proof, when taken, showed that the delay was caused by the action

of appellants or other circumstances which excused appellee, such delay, under a fair construction of the will, would not prevent the society from having title to the farm. The proof on the second hearing showed clearly, as held by the chancellor, that the circumstances which produced the delay were such that they do not prevent the missionary society from establishing and maintaining the orphanage as provided in the will and having title to the farm. The legal conclusion of the court in that regard is fully sustained by the authorities in other jurisdictions and is in accord with the universal application of the rules of construction as to charities in this country and in Great Britain.

This being our conclusion, the decree of the circuit court will be affirmed.

*Judgment affirmed.*

DUNN, J., THOMPSON, C. J., and CARTWRIGHT, J., dissenting:

The devise to the Woman's Home Missionary Society was subject to the condition that the society, if it desired to accept the devise on the terms proposed, should file a written acceptance with the executor within one year after the probate of the will, and if it did not do so the premises should be sold by the executor and the proceeds divided among the heirs of the testatrix and the heirs of her deceased husband, and if, after having accepted the devise, the society should fail or neglect to establish the orphanage within three years after the testatrix's death, the devise should become void and the land should be divided among the heirs of the testatrix and the heirs of her deceased husband. The written acceptance was filed but the orphanage was not established until more than three years after the death of the testatrix. After the expiration of more than three years after the testatrix's death, and after the failure to establish the orphanage during that time, some of the devisees over began this proceeding, which is an action at

law for the partition of the premises, by filing a statutory petition for that purpose.

The report of the former appeal (*Peek* v. *Woman's Home Missionary Society,* 293 Ill. 337,) sets forth the paragraph of the will containing the devise, the pleadings and the facts as they appeared in the record at that time. The judgment was reversed because it was held that the court erred in sustaining a demurrer to the first plea and in sustaining objections to testimony offered to support it. The discussion which appears in the opinion of testimony in support of a plea which was not in the case, a demurrer having been sustained to it and no evidence for or against it being admissible, cannot be considered as an adjudication of fact upon that plea but must, of course, be regarded in the nature of illustration or argument only, and has no reference to facts subsequently proved on issue made upon the replications filed after remandment to the circuit court. The cause was remanded practically for the purpose of forming issues on the first plea and trying such issues. It was held that the evidence did not sustain the second plea. A demurrer had been sustained to the third plea, nothing was said about it in the opinion, no further action was taken on it after remandment, and it was therefore of no importance on the trial. As to the fourth plea, evidence was introduced of the expenditures made by the appellee and its receipts from rents, and the rental value of the premises while it occupied them are shown to be largely in excess of its payments. As to the first plea, when the cause was re-instated in the circuit court the petitioner filed three replications, and the missionary society filed a rejoinder taking issue on each replication.

The second trial was upon the issues of fact raised by the three replications to the first plea which denied the averments of that plea, (1) that the delay in establishing the orphanage was caused wholly by the filing of the bill based upon the alleged want of legal capacity of the ap-

pellee to take title to the premises and the litigation follow-
ing thereafter and the acts of David B. Eaton and the other
parties to that suit; (2) that the appellee prior to March 1,
1916, and as promptly as it could do so, did establish the
orphanage in accordance with the terms of the will; (3)
that the appellee did establish the orphanage in accordance
with the terms of the will. On these issues the court found
that the appellee did not fail and neglect, as alleged in the
petition, to establish a home for orphan children or orphan-
age upon the lands, but, on the contrary, the court found
that the appellee "did establish upon the said lands, and
has since maintained and does now maintain, a home for
orphan children, or orphanage, known as the Peek Orphan-
age, all of which the court finds has been done in compli-
ance with the said last will and testament of said Martha
E. Peek, deceased." These findings are not, in terms, re-
sponsive to the issues or in accordance with the evidence
or the claims of any of the parties. The orphanage was
not established within three years after the death of the
testatrix, as required by the terms of the will, and no one
claims that it was so established. There is no such issue
in the case, but the issue raised under the first plea pre-
sented only the question whether the facts shown relieved
the appellee of performance and vested the title in it with-
out performance of the condition. There is no specific
finding of the date when the orphanage was established,
but, contrary to all the evidence and the admissions of the
parties, the court finds that it was done in compliance with
the will. On the only substantial issue on the plea, which
was the sole cause of the reversal on the former appeal,
as to whether the delay in establishing the orphanage was
caused by the filing of the bill calling in question the ap-
pellee's capacity to take the title and the subsequent liti-
gation and by the acts of David B. Eaton and other par-
ties to that suit both before and after its final disposition,
the court made no finding.

There is no disputed fact in the case, no contradiction in the evidence. Mrs. Peek died June 17, 1912. Her will was admitted to probate July 31, 1912. On July 24, 1913, David B. Eaton, one of the heirs of Mrs. Peek and the executor of her will, filed the bill mentioned in the plea, claiming that the appellee was incapable, in law, of taking title under the will. The bill was dismissed on a hearing for want of equity. The decree was affirmed by the Supreme Court on June 16, 1914, and on February 29, 1916, more than three years and eight months after Mrs. Peek's death, the appellee obtained possession of the land and established an orphanage upon it.

At Mrs. Peek's death the land was in the possession of Henry D. Rebuck, as tenant under a written lease made in 1908, which was not in evidence but which Rebuck testified "terminated from year to year," and provided that either party desiring to terminate the lease at the end of any year should give the other six months' notice. The lease was in the possession of Harry Typer, a lawyer at Polo, before Mrs. Peek's death, and after her death her executor, David B. Eaton, got it. There was no copy of it. Eaton, the executor, claimed the rent for the first two years after Mrs. Peek's death, due March 1, 1913 and 1914, and it was paid to him. The third and fourth years the rent was paid to the appellee. The appellee made no attempt to compel the surrender of the possession of the farm to it, but in the face of the refusal of the tenant to surrender, without taking any action whatever to gain possession, waited until several months after the expiration of the time within which it was required to establish the orphanage, when the possession was voluntarily surrendered to it by the tenant.

The testimony which counsel for the appellee contend sustains their claim that the delay in establishing the orphanage was caused by litigation and the acts of the appellants is summed up by them in their briefs, as follows: "The

first year saw the executor in possession of the farm
claiming it for the estate and found both the Eatons and
the Peeks openly disputing the right of the society to take
the farm.   The second year was entirely consumed by the
litigation started by the Eatons to enforce their claim that
the society was not lawfully authorized to take the farm.
The third year and eight months of the fourth year were
consumed by the repeated efforts of the society to get pos-
session of the farm and to oust the tenant, Rebuck.   In
these efforts four different officers of the society, as well
as Mr. Kingery, who was an honorary member of the so-
ciety, and Mr. Rigby, who was its attorney, took part.   It
is difficult to see how the society could have been more
diligent or could have taken any further steps to establish
the orphanage sooner than it did."

The executor had no right to collect the rents for the
first year after the testatrix's death.   The farm was in the
possession of a tenant, and there was nothing in the claim
of the executor to prevent the appellee from compelling
the payment of rent to it.  There was nothing to prevent
the appellee from recovering the possession of the prem-
ises on March 1, 1913.   It is true that it did not have the
lease, but by the slightest effort it could have obtained it
or a copy of it.   It never asked for a copy, made no ef-
fort to obtain a copy and no effort to obtain possession of
the land.   The Eatons and the Peeks took no action for
a year to establish any interest in the farm, and it has
never before been held that the mere verbal claim of an ad-
verse interest would prevent the running of the Statute of
Limitations for the recovery of land or was an excuse for
*laches* in bringing a suit to recover possession or in the per-
formance of a condition on which a right depended.

Conceding that the delay of the appellee during the
eleven months of the pendency of the suit was excused by
reason of such pendency, there still remained a year after
the final decision of that case in the Supreme Court in favor

of the appellee in which no effort was made to comply with the condition of the will, and no legal obstacle existed to such compliance. That decision adjudicated the title in the appellee's favor. (*Eaton* v. *Woman's Home Missionary Society,* 264 Ill. 88.) Nothing remained to be done except for the appellee to take possession of the farm and establish the home. No objection was made in the way of litigation, adverse claim or otherwise except on the part of the tenant, who never made any greater claim than that he was entitled to six months' notice to quit before the end of the year. There were two and a half months in which to give this notice after the case in the Supreme Court was decided and more than two years after the death of the testatrix. In fact, no notice was given for more than sixteen months after the end of all litigation and more than three years after the death of the testatrix. The repeated efforts of the society to get possession of the farm and to oust the tenant, referred to by the counsel for the appellee, are wholly imaginary. The only action ever taken looking toward a compliance with the condition consisted of a resolution of the National Convention of the Woman's Home Missionary Society accepting the devise, the filing of the written acceptance with the executor and the county court of Ogle county, and the appointment by the Rock River Conference of a chairman, who selected her associates constituting the local Peek Orphanage committee. The repeated efforts of the society consisted simply of occasional visits to the farm and conversations with Rebuck, the tenant. Mrs. Ray, who was chairman of the committee, testified that she went over to the farm in 1912 and had a talk with Rebuck about his moving off the farm. She asked him if he had a lease, and he said he had but did not say where it was, and she never saw it or tried to see it. She talked with him in the fall of 1913 and in 1914 about getting possession. He said he would stay there as long as he wanted to and when he got ready he would

move.   In answer to the question, "What you did in reference to trying to get on that farm,—just tell it in your own words," she said: "Well, we went down there several times,—sometimes some of the local people and sometimes some of the people from Chicago who were on that committee, Mrs. Kingery of Oak Park and Mrs. Dangel of Oak Park.   We went down together some time in the spring of 1913, after Mr. Rebuck refused to move off that March,—the latter part of March or first of April.   Mrs. Kingery was national chairman.   I asked him to give us the privilege of going on there to make some improvements and to start a building for the forming of this orphanage. Mr. Rebuck said, 'As long as I stay here you will never turn a shovel full of dirt on this place,' and then we endeavored to get him to take some children to board after we found we couldn't get on the place, and he refused to do that.   I never had any other talk in regard to that.   I had not talked myself with him prior to that.   I was not there prior to that."   She testified further that she did nothing personally to get possession except what she had told, and that she served a notice on Rebuck in November, 1915, but she does not state what the notice was.   This was more than three years after Mrs. Peek's death.   Mrs. Dangel, who is vice-president of the Rock River Conference organization of the Woman's Home Missionary Society, corroborated Mrs. Ray's account of the interview with Rebuck when Mrs. Dangel was present, and testified to a similar interview the next day and another in January, 1916, when Rebuck again refused permission to place children on the farm.   In answer to a question by the court she said that the sole reason the society did not establish an orphanage on the farm was that it could not get possession of the farm.   Mrs. Kingery also testified to the interview in April, 1915, and to another in the fall.   She also testified that her husband made two trips to Polo in the interest of the work and also went with Rigby in the winter of 1915, but

she did not tell anything that these two gentlemen did. These women all testified that they never heard Rebuck say he was entitled to six months' notice to quit.

This is all the evidence of anything done to get possession of the farm or comply with the condition of the devise. Nothing was done. There was talk with Rebuck and nothing more. There were no "tactics of the tenant, Rebuck," tending to prevent the recovery of possession of the farm. He simply declined voluntarily to surrender possession but never interposed any obstacle to legal proceedings to dispossess him, and the society never began any such proceedings though there was nothing to hinder the recovery of possession. The burden was on the appellee to show a compliance with the condition, or, at least, reasonable diligence in an earnest effort to comply. It does not show reasonable diligence in one entitled to possession of real estate whose title depends upon his recovery and possession within a year, to let that whole period elapse without taking any action to recover possession merely because the person in possession refuses to surrender. No person of reasonable prudence would so neglect his own interest.

If private rights, only, were involved there could be no question about the application of the rule. The gift to the missionary society was a charitable devise, but it was not, therefore, exempt from the ordinary rules which apply to the devolution of property. While charitable gifts may be regarded by courts with special favor, the courts have no right to disregard the intentions expressed by donors as to the conditions on which their gifts shall be enjoyed. A general gift to charity may be sustained though it may be impossible to carry it out in the particular manner indicated, but where the donor has seen fit to impose a condition upon the enjoyment of his beneficence, courts have no right to disregard the condition and enforce the gift at the expense of those whose rights are founded upon the condition.

In our opinion the judgment should be reversed.